WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lucy Rondan, | No. CV-14-00819-PHX-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, | |
| Defendant. | |

Plaintiff Lucy Rondan seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying her application for benefits under the Social Security Act (the Act).  The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b), and have filed briefs in accordance with Local Rule of Civil Procedure 16.1.  As set forth below, the Court affirms the Commissioner's decision.

## I. Procedural Background

On August 27, 2010, Plaintiff applied for a period of disability and disability insurance benefits under Title II the Act.  (Tr. 25.)[1]  Plaintiff alleged that she had been disabled since September 15, 2008.  (*Id.*)  After the Social Security Administration (SSA) denied Plaintiff's initial application and her request for reconsideration, she requested a

---

[1]  Citations to "Tr." are to the certified administrative transcript of record. (Doc. 15.)

hearing before an administrative law judge (ALJ).  After conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act.  (Tr. 15-36.)  This decision became the final decision of the Commissioner when the Social Security Administration Appeals Council denied Plaintiff's request for review.  (Tr. 1-6); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals Council.)  Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

## II.    Administrative Record

The record before the Court establishes the following history of diagnosis and treatment related to Plaintiff's alleged impairments.  The record also includes opinions from state agency physicians who examined Plaintiff or reviewed the records related to her impairments, but who did not provide treatment.

### A.    Medical Treatment Evidence

#### 1.    Treatment for Physical Impairments

In June 2010, Plaintiff's primary care physician referred her to Gabriel Colceriu, M.D., at the rheumatology clinic at St. Joseph's Hospital and Medical Center.  (Tr. 351.) Plaintiff complained of pain in her knees, hands, wrists, neck, left shoulder, and hip.  (*Id.*) On examination, Dr. Colceriu noted bilateral crepitation of the first CMC joints, bilateral patellofemoral crepitation with "exquisite tenderness to palpation over the media meniscal area bilaterally," and bilateral valgus deformities.  (Tr. 352.)  He also noted that Plaintiff was in no acute distress, she had normal rotation in her hips, full range of motion in her lower extremities, and her "hand grip was intact."  (*Id.*)  Dr. Colceriu noted that an x-ray of Plaintiff's knee from 2009 showed minimal degenerative changes.  (Tr. 353.) An x-ray of Plaintiff's right hand from 2009 showed degenerative arthritis at the first CMC and second and third distal interphalangeal (DIP) joints.  (Tr. 353.)  Dr. Colceriu diagnosed polyarthritis in the absence of rheumatoid arthritis and prescribed oxycodone. (*Id.*)

Dr. Colceriu's treatments records from July 12, 2010, note continued joint pain in Plaintiff's knees, hands, and lower back, which was mildly alleviated with oxycodone

taken several times a day.  (Tr. 348.)  On examination, Plaintiff had mild crepitation in her "first CMC bilaterally," normal rotation in her hips, crepitation in her knees, and her left knee was tender to palpation over the medial and lateral meniscus.  (Tr. 349.)  Dr. Colceriu prescribed fentanyl.  (*Id.*)

On August 23, 2010, Plaintiff sought treatment from orthopedic surgeon Dr. Robert Kasa.  (Tr. 403.)  On examination, Plaintiff was in no acute distress and was alert and oriented with a normal mood and affect.  (*Id.*)  Dr. Kasa noted bilateral antalgic gait (limping) and valgus deformities of both knees, with "crepitation at the patellofemoral joint with a range of motion."  (*Id.*)  Dr. Kasa also ordered x-rays that showed "no real patellofemoral arthritic changes or mild ones if any."  (Tr. 403.)  He noted some "mild arthritic changes of the medial and lateral compartment of the knee and a valgus alignment with mild narrowing laterally."  (*Id.*)  He stated that "[a]ll of the changes [were] quite mild."  (*Id.*)  Dr. Kasa administered steroid injections in both knees. (Tr. 404.)

Plaintiff retuned to Dr. Colceriu in September 2010.  During a September 29, 2010 examination, Dr. Colceriu noted that Plaintiff was in no acute distress.  (Tr. 345.)  He noted "significant crepitations" in both first carpometacarpal joints and crepitation in both knees, but no active synovitis.  (Tr. 346.)  He noted full range of motion in Plaintiff's elbows, and mild tenderness in Plaintiff's back on palpation.   (*Id.*)  Dr. Colceriu concluded that degenerative arthritis was "the most likely etiology of [Plaintiff's] polyarthralgias," or joint pains.  (Tr. 346.)  He noted that "MS Contin 15" had "helped the pain but not significantly."  (Tr. 345.)  Dr. Colceriu ordered an x-ray of Plaintiff's cervical spine, which revealed multilevel degenerative disc disease, mild at C-3-C-4 and C7-T1, and "moderate to moderately severe at the C4-C5 through C6-C7 levels," with reversal of the normal lordotic curvature of the spine related to muscle spasm, and "moderate to moderately severe bilateral neural foraminal narrowing at the C3-C4 through C6-C7 levels."  (Tr. 356.)

At a November 2010 appointment, Dr. Colceriu noted that Plaintiff did not have "radicular symptoms in terms of neuropathic changes in her arms or decreased strength." (Tr. 388.)  Plaintiff reported that fentanyl had helped her pain "tremendously," but she was not pain free.  (*Id.*)  On examination, Plaintiff was in no acute distress, she had no palpable synovitis, her left shoulder had an improved range of motion, her neck had normal flexion, extension, and rotation, she had mild to moderate tenderness in her back on palpation, crepitation in her lower extremities, and no synovitis.   (Tr. 389.) Dr. Colceriu increased Plaintiff's dosage of fentanyl.  (*Id.*)

Dr. Colceriu ordered a cervical MRI in December 2010.  (Tr. 390-91.)  The MRI showed mild narrowing of the spinal cord neuroforaminal throughout C2 through C7, "mild narrowing of the central spinal canal and flattening of the anterior [spinal] cord" at C4-5, and a disc osteophyte complex (bone spur) and bilateral facet arthrosis that caused "mild narrowing of the central spinal canal and flattening of the anterior [spinal] cord . . . [at C6-7]."   (Tr. 390-91.)   The MRI also revealed "severe narrowing of the left neuroforamen." (*Id.*)

During a February 28, 2011 appointment, Dr. Colceriu noted that Plaintiff had an episode of sciatica and heel pain several weeks before the appointment when she moved to a new place. (Tr. 386.)  Plaintiff reported that she was "quite happy" with pain control from fentanyl, and she did not have any episodes of joint swelling.  (*Id.*)   On examination, Plaintiff ambulated without assistance and she had no synovitis in her hands or wrists.  (Tr. 386.)  Plaintiff had tenderness to palpation and "mild crepitation in fourth metacarphophalangeals bilaterally." (Tr. 386-87.)  She had an average range of motion in her shoulder, mild tenderness in her lumbar spine on palpation, lower extremity crepitation, and tenderness in her right heel on palpation.  (Tr. 387.)  Dr. Colceriu noted "that Plaintiff's "cervical spondylitic symptoms [had] gone away." (*Id.*)  Dr. Colceriu diagnosed diffuse osteoarthritis and degenerative joint disease in multiple locations in Plaintiff's lower back, cervical spine, and hands "with no evidence of inflammatory

arthropathy."  (*Id.*)  Dr. Colceriu increased Plaintiff's dosage of fentanyl and continued her prescription for morphine.  (Tr. 387.)

On April 28, 2011, Dr. Colceriu noted that Plaintiff's pain was "better controlled" with the increased dosage of fentanyl, but that Plaintiff had stopped using it due to side effects and had increased her use of morphine.  (Tr. 384.)  Plaintiff reported falling on her left knee and sustaining some bruising, but she could walk without assistance.  (*Id.*)  On examination, Dr. Colceriu noted that Plaintiff walked without assistance, had no synovitis in her upper extremities, her lower extremities had some crepitation and bruising, but no instability.  (*Id.*)  He also observed that Plaintiff's back was tender to palpation throughout.  (*Id.*)  Dr. Colceriu diagnosed diffuse degenerative joint disease and recommended that Plaintiff restart fentanyl at the lower dose she had previously tolerated, and that she reduce morphine.  (*Id.*)

On June 6, 2011, Dr. Colceriu noted that Plaintiff was doing much better on her new doses of fentanyl and morphine.  (Tr. 382.)  Plaintiff did not report any side effects from the new combination of medications and her "pain [was] better controlled overall." (*Id.*)  Plaintiff had moved into a two-story house and reported difficulty climbing stairs. (*Id.*)  On examination, Plaintiff walked unassisted with a slow gait.  (*Id.*)  She had no synovitis in her upper extremities, a full range of motion in her upper extremities, moderate tenderness in her back on palpation, "severe crepitation in both knees," but no lateral instability, no warmth, and no redness.  (Tr. 382.)  Dr. Colceriu administered a corticosteroid injection to Plaintiff's left knee.  (Tr. 383.)  He assessed diffuse degenerative joint disease and noted that Plaintiff was "doing much better clinically on a combination of fentanyl 37 mcg and morphine sulfate 15 mg ER."  (*Id.*)

In August 2011, Dr. Colceriu noted that Plaintiff had reported that the corticosteroid injection in the left knee helped for a week and then her pain returned "to normal."  (Tr. 562.)  Plaintiff also reported that her left knee buckled more frequently, she had problems climbing stairs and walking in a straight line, she limped all the time, and had unbearable pain daily.  (*Id.*)  Plaintiff stated that morphine and fentanyl helped

"minimally." (*Id.*)  On examination, Dr. Colceriu noted that Plaintiff limped, she had "severe grinding and more than 25 degrees of valgus on the left but 10 degrees of valgus on the right with crepitation on the right . . . ." (*Id.*)  He also noted that she had no warmth over her joints. (*Id.*)  Dr. Colceriu assessed "diffuse osteoarthritis/degenerative joint disease including the lower spine, cervical spine, and knees." (*Id.*)  He noted that Plaintiff's pain was "uncontrolled," and stated that because pain medication, steroids, and range of motion exercises did not help, he would increase her dose of fentanyl and refer her for possible total knee replacement surgery. (*Id.*)  Dr. Colceriu also stated that he would "take into consideration the fact that the left knee ha[d] an exaggerated valgus angle, which ma[de] the mechanics of her mobility even worse." (Tr. 562.)

During a November 2, 2011 examination, Plaintiff reported joint pain and stiffness, but no swelling. (Tr. 559.)  Plaintiff was in no acute distress and ambulated independently. (Tr. 560.)  She had joint tenderness in her upper extremities with no active synovitis, tender paraspinal muscles, and crepitation in both knees. (*Id.*)  Plaintiff walked with a limp and had a normal hand grip. (*Id.*)  Dr. Colceriu noted that Plaintiff "failed" range of motion exercises and "steroid trial." (*Id.*)  He continued Plaintiff's prescriptions for fentanyl and morphine. (*Id.*)

At a February 24, 2012 appointment with Dr. Colceriu, Plaintiff complained of pain her in knees and back that was worse with activity and cold. (Tr. 556.)  Plaintiff reported joint pain and stiffness, but no swelling or muscle pain. (*Id.*)  She stated that physical therapy had helped in 2010. (*Id.*)  On examination, Dr. Colceriu noted that Plaintiff was in no acute distress and ambulated independently with a mild limp. (Tr. 557.)  She had joint tenderness in her upper extremities with no synovitis. (*Id.*)  She had non-focal tenderness in her spine, crepitation in both knees, and a normal hand grip. (*Id.*)  Dr. Colceriu continued Plaintiff's prescriptions for medications and stated that he would refer her to physical therapy when she returned from Sierra Vista.[2] (*Id.*)

---

[2] Plaintiff planned to move to Sierra Vista, Arizona, to assist her brother who was ill. (Tr 588, 592.)

During a July 19, 2012 appointment, Plaintiff reported that she had been "run over by a car" and contracted an infection that required hospitalization.  (Tr. 552.)  She reported continued pain that was worse in her back.  (*Id.*)  She had stopped using morphine and was using "short acting pain pills" and fentanyl.  (*Id.*)  She reported that her pain was better with medication.  (*Id.*)  On examination, Plaintiff was in no acute distress and ambulated independently.  (Tr. 554.)  She had mild joint tenderness in her upper extremities, no synovitis or atrophy, a full range of motion in both of her elbows, a normal hand grip, crepitation in both knees, no active synovitis in her lower extremities, and walked with a limp.  (*Id.*)  Dr. Colceriu assessed osteoarthritis and cellulitis in her Plaintiff's left leg.  (*Id.*)

Plaintiff returned to Dr. Colceriu for a follow up on September 20, 2012. (Tr. 548.)  She reported that she had surgery for her left leg infection.  (*Id.*)  She reported that she mainly had pain in her lower left extremity, but also had pain in her back and hands.  (*Id.*)  Her pain was better with medication and worse with ambulation and activity.  (*Id.*)  She did not report any joint swelling or redness.  (*Id.*)  On examination, Plaintiff was in no acute distress and ambulated independently.  (Tr. 549.)  She had tenderness in the joints of her upper extremities, but no active synovitis or atrophy.  (*Id.*)  She had a full range of motion in both elbows and a normal grip.  (*Id.*)  Plaintiff had tenderness in her paraspinal muscles, crepitation in both knees, no active synovitis in her lower extremities, and walked with a limp.  (*Id.*)  Dr. Colceriu noted that Plaintiff had osteoarthritis at several sites and prescribed fentanyl and ibuprofen. (Tr. 550.)

### 2.    Treatment for Mental Impairments

In December 2009, Plaintiff had an initial psychiatric examination at the Pinal Hispanic Council in Coolidge, Arizona.  (Tr. 317-21.)  Plaintiff reported experiencing depression for the previous seven years.  (Tr. 317.)  On examination, Plaintiff was oriented, she had good hygiene, appropriate affect, a depressed mood, normal speech, logical associations, unremarkable stream of thought, non-psychotic thought content, no thoughts of harm, normal perception, good concentration, intact memory, and good fund

of knowledge, insight, and judgment.  (Tr. 319-20.)  Plaintiff was diagnosed with major depressive disorder, moderate, recurring (Tr. 320), and prescribed Lexapro and Ambien. (Tr. 321.)

On September 14, 2010, a psychiatric nurse practitioner (NP), Judy Yurgel, noted that Plaintiff's mental status examination was unremarkable.  (Tr. 402.)  She found that Plaintiff was alert and oriented.  (*Id.*)  She had good concentration, unremarkable speech and thought process, no destructive thoughts, intact memory, and good insight and judgment.  (*Id.*)  NP Yurgel diagnosed major depressive disorder, discontinued Ambien due to side effects, and prescribed Vistaril.  (*Id.*)  On April 2, 2011, NP Yurgel again described Plaintiff's mental status examination as unremarkable.  (Tr. 397.)  She noted that Plaintiff was alert and oriented.  (*Id.*)  She had good concentration, no psychosis, unremarkable speech and thought process, no thoughts of harm, intact memory, and good insight and judgment.  (*Id.*)  NP Yurgel diagnosed major depressive disorder and prescribed Lexapro and Trazadone.  (*Id.*)  A July 8, 2011 progress note indicates that Plaintiff was alert and oriented.  (Tr. 462.)  She had good hygiene, good eye contact, normal motor activity, appropriate affect, a euthymic mood, normal speech, logical associations, an unremarkable stream of thought, non-psychotic thought without depressive content, no thoughts of harm, normal perception, good concentration, intact memory, good fund of knowledge, and good insight and judgment.  (Tr. 464-65.)

After Plaintiff moved to Phoenix, she received treatment at Terros from December 2011 through September 2012.  (Tr. 434, 569-632.)  On December 6, 2011, Plaintiff reported that she had sadness daily and that she sometimes felt like she could cry all day. (Tr. 631.)  She reported that she lived with her adult daughter and that she provided for her, cooked for her, and cared for "the animals."  (*Id.*)  Plaintiff reported that she got along well with others, loved to cook, and that family values were important to her. (Tr. 614.)  The progress note indicates that Plaintiff was calm, had good interaction, and a depressed mood.  (Tr. 625)  She was not a danger to herself or others.  (Tr. 624.)  Plaintiff had an appropriate affect, articulate speech, relevant thought process, depressive thought

content, good recall of events, average intelligence, limited judgment, and fair insight. (Tr. 618.)

In December 2011, a progress note from Terros indicates that Plaintiff had "slight progress." (Tr. 606.) Plaintiff was encouraged to attend a women's counseling group. (Tr. 605.) Her diagnosis remained major depressive disorder. (Tr. 602-04.) On December 16, 2011, Plaintiff reported that she slept too much, did not go out in public, cried a lot, wanted to be by herself, had "horrible" concentration, and mood swings. (Tr. 594.) The progress note indicates that Plaintiff was alert and oriented. (Tr. 596-97.) She had good eye contact, normal motor activity, a tearful affect, an anxious and depressed mood, normal speech, logical thought process, unremarkable stream of thought, non-psychotic thoughts, depressive thought content, no thoughts of harm, normal perception, poor concentration, intact memory, and good intellect, insight, and judgment. (Tr. 596-98.) Plaintiff was diagnosed with major depressive disorder in partial remission. (Tr. 598.)

On January 2, 2012, Plaintiff left a voice mail message for her healthcare provider at Terros stating that she need to reschedule her January 13, 2012 appointment because she was going to be out of town for three months caring for a terminally ill family member. (Tr. 592.) Plaintiff's appointment was reset to January 6, 2012. During that appointment, Plaintiff reported that her brother who lived in Sierra Vista was sick and wanted her to help manage his tax preparation business. (Tr. 588.) Plaintiff did not report any side effects from her medication. (*Id.*) The progress note indicates that Plaintiff was alert and oriented. (Tr. 588-89.) She had good appearance, good eye contact, normal motor activity, appropriate affect, euthymic mood, normal speech, logical thought process, no psychotic or depressive thought content, no thoughts of harm, normal perception, good concentration, intact memory, and good intelligence, insight, and judgment. (Tr. 589.) She was diagnosed with major depressive disorder in partial remission. (Tr. 590.)

On March 22, 2012, a Terros provider telephoned Plaintiff for a wellness check. (Tr. 587.)  Plaintiff reported that she planned to attend the women's counseling group when she "moved back" after helping her brother.  (*Id.*)  The progress note indicates that Plaintiff had been "going back and forth to help her brother."  (*Id.*)

On March 23, 2012, Plaintiff had an appointment with Beatrice Yang, M.D. (Tr. 584-86.)  Plaintiff reported no side effects from her medication.  (Tr. 584.)  Plaintiff was alert and oriented.  (Tr. 584-85.)  She had good appearance, good eye contact, normal motor activity, tearful affect, euthymic mood, normal speech, logical thought process, non-psychotic and non-depressive thought content, no thoughts of harm, normal perception, good concentration, intact memory, and good intelligence, insight, and judgment.  (Tr. 585.)  Dr. Yang diagnosed major depressive order in partial remission. (Tr. 586.)

During a June 11, 2012 telephonic wellness check, Plaintiff reported no side effects from her medication.  (Tr. 580.)  During a June 13, 2012 appointment with Dr. Yang, Plaintiff was alert and oriented.  (Tr. 578.)  She had good eye contact, normal motor activity, appropriate affect, euthymic mood, normal speech, logical thought process, non-psychotic and non-depressive thought content, no thoughts of harm, normal perception, good concentration, intact memory, and good intelligence, insight, and judgment.  (*Id.*)  Dr. Yang diagnosed major depressive disorder in partial remission. (Tr. 579.)

Plaintiff next saw Dr. Yang on September 10, 2012.  (Tr. 570.)  She was alert and oriented.  (Tr. 571.)  She had good eye contact, normal motor activity, appropriate affect, euthymic mood, normal speech, logical thought process, unremarkable stream of thought, non-psychotic and non-depressive thought content, no thoughts of harm, normal perception, good concentration, intact memory, and good intelligence, insight, and judgment.  (*Id.*)  Plaintiff was diagnosed with major depressive disorder in partial remission.  (Tr. 572.)

B.    **Opinion Evidence**

1.    **William Chaffee, M.D.**

On August 31, 2011, Plaintiff saw William Chaffee, M.D., for a physical examination related to her application for disability benefits.  (Tr. 444-48.)  Dr. Chaffee noted that he reviewed Dr. Colceriu's progress notes from June 2011, the report of a December 2010 cervical MRI scan, 2011 x-rays of Plaintiff's knees, and a July 14, 2011 function report that Plaintiff completed.  (Tr. 444, 447.)  Plaintiff complained of chronic joint pain, leg pain, and poor sleep.  (Tr. 444-45.)  On examination, Plaintiff had normal range of motion in her cervical, thoracic, and lumbar spine.  (Tr. 446.)  Her hip, knee, ankle, shoulder, elbow, wrist, and elbow joints were "within normal limits bilaterally." (*Id.*)  She had a normal gait and station and could squat and heel-toe walk normally.  (*Id.*) She had "straight leg raising 60 degrees right and left without pain supine."  (Tr. 447.) Dr. Chaffee found that Plaintiff had a genu valgus bilaterally, no swelling or crepitation in either knee, and slight tenderness in both wrists without swelling.  (*Id.*)  Plaintiff had normal muscle tone and bulk, and full strength in her upper and lower extremities, including "grip strength and pinch strength."  (*Id.*)  Dr. Chaffee diagnosed chronic polyarthralgias and opined that Plaintiff did not have a condition that would impose limitations for twelve continuous months.  (*Id.*)

2.    **Sharon Steingard, D.O.**

On August 4, 2011, Plaintiff was examined by Sharon Steingard, D.O., for her disability benefits application.  (Tr. 433-39.)  Dr. Steingard noted that she reviewed an adult function report that Plaintiff completed and progress notes from the Pinal Hispanic Council.  (Tr. 433.)  Plaintiff reported that she was stressed and depressed.  (Tr. 434.) She described herself as forgetful and distracted.  (*Id.*)  She stated that she got along "fairly well" with her adult children.  (*Id.*)  Plaintiff had no suicidal attempts or psychiatric hospitalization.  (*Id.*)  She reported that she lived with her adult daughter. (Tr. 435.)  During a typical day, Plaintiff spent forty-five minutes on the computer, read

the bible, listened to music, cared for household pets, and did light cooking.  (Tr. 436.)
She stated that she sometimes needed reminders to maintain her personal hygiene.  (*Id.*)

On examination, Plaintiff was clean, appropriately dressed, and alert.  (Tr. 436.)
She had normal posture and a normal gait and station.  (*Id.*)  After sitting during the
interview, she was stiff on standing.  (*Id.*)  Plaintiff had good eye contact, satisfactory
attention, unremarkable speech, logical associations, and unremarkable stream of
thought.  (Tr. 436.)  She was tearful and cried the entire interview, she seemed depressed,
and had a sad facial expression and a labile affect.  (*Id.*)  Plaintiff was not helpless or
hopeless and was goal-directed to continue treatment.  (*Id.*)  She had some suicidal
ideation without any intention or plan to hurt herself.  (*Id.*)  She had limited insight and
judgment, a poor general fund of knowledge, and trouble with memory.  (*Id.*)
Dr. Steingard diagnosed Plaintiff with major depressive disorder, recurrent.  (Tr. 437.)

Dr. Steingard completed a Psychological/Psychiatric Medical Source Statement.
(Tr. 438-39.)  In areas of understanding and memory, Dr. Steingard found that Plaintiff
would need to have some instructions repeated, and that she would have more problems
with detailed instructions or complicated procedures.  (Tr. 438.)  She also found that
Plaintiff had a limited ability to multitask, "displayed some trouble with frustration
tolerance," "got a little agitated when asked for some simple general information," and
"could not recall any objects at three minutes."  (*Id.*)

In areas of sustained concentration and persistence, Dr. Steingard found that
Plaintiff's "persistence [was] likely to be limited by her limited frustration tolerance."
(*Id.*)  She "appear[ed] capable of carrying out some simple instructions[, and her]
[a]ttention and concentration were adequate over the course of the interview."  (*Id.*)  In
areas of social interaction, Dr. Steingard noted that Plaintiff displayed "[e]motional
lability . . . ," and she "was almost constantly tearful and crying.  This would be
inappropriate behavior in the work place."  Dr. Steingard also noted that Plaintiff would
"likely be somewhat irritable with supervisors."  (*Id.*)  In areas of adapting to change,
Dr. Steingard noted that Plaintiff had a poor ability to respond appropriately to changes in

the work setting.  (Tr. 439.)  She opined that Plaintiff's concentration appeared adequate for typical work place hazards.  (*Id.*)  Dr. Steingard also found that Plaintiff could perform "some limited problem solving, but [was] likely to be easily overwhelmed."  (*Id.*)

### III.  The Administrative Hearing

Plaintiff was in her early fifties at the time of the administrative hearing and the ALJ's decision.  (Tr. 164.)  She had the equivalent of a high school education.  (Tr. 170.)  Plaintiff had past relevant work as a census enumerator, cashier, childcare provider, office assistant, office manager, and billing clerk.  (Tr. 70-71.)

At the administrative hearing, Plaintiff testified she stopped working for Fry's Marketplace in 2008 because she had pain in her knees, and her feet would swell.  (Tr. 58.)  She later testified that she was fired from Fry's Marketplace for misuse of coupons.  (Tr. 61.)  Plaintiff stated that she was unable to work because she could not "stand or sit long, for long hours."  (Tr. 55.)  She explained that she could not stand for prolonged periods because her knees would swell.  (*Id.*)  She could not sit for long periods because it caused pain in her low back and, if she sat for too long, it was hard for her to get up.  (*Id.*)  She also testified that she had arthritis in her hands and woke up with "a lot of swelling . . . and pain in [her] hands."  (Tr. 56.)  She stated that she had "a lot of weakness also in [her] hands when it [came] to lifting or holding things in [her] hands."  (*Id.*)  She testified that medication helped.  (*Id.*)  Plaintiff also testified that she could not work because she was uncomfortable around other people — "I just get frustrated and irritated at all the people around me" — and had difficulty concentrating.  (Tr. 60-61.)  She testified that medication helped.  (*Id.*)

Plaintiff estimated that she could stand or walk for up to fifteen minutes at a time.  (Tr. 67-68.)  Plaintiff testified that she elevated her leg three or four times a day, for about an hour at a time.  (Tr. 67.)  She stated that she could perform "light housework," but could not vacuum or mop.  (*Id.*)  Plaintiff could sit at a computer for up to two hours.  (Tr. 57.)  Plaintiff testified that, after a car accident in 2012, she used a walker or a

- 13 -

wheelchair to get around.  (Tr. 59.)  The ALJ noted that Plaintiff was not using an assistive device at the administrative hearing; Plaintiff stated that her walker was in the car.  (*Id.*)

A vocational expert also testified at the administrative hearing.  (Tr. 68-77.)  The ALJ's disability determination was not based on the vocational expert's testimony, because, as discussed below, the ALJ concluded her analysis at step two of the five-step sequential evaluation process, *see* Sections IV.A and IV.B, by finding that Plaintiff did not have any severe impairments.  The Court does not discuss the vocational expert's testimony because it is not relevant to determining whether the ALJ erred at step two of the sequential evaluation process.

## IV.    The ALJ's Decision

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits).  To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

### A.    The Five-Step Sequential Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her medically determinable impairment or combinations of impairments is severe. 20 C.F.R. §§ 404.1520(b) and (c), 416.920(b) and (c).  If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five. At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404.  20 C.F.R. § 404.1520(a)(4)(iii).    20 C.F.R. §§ 404.1520(d),

416.920(d).  If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant numbers in the national economy, considering the claimant's RFC, age, work experience, and education.   20 C.F.R. §§ 404.1520(g), 416.920(g).   If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

**B.     The ALJ's Application of the Five-Step Evaluation Process**

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, September 15, 2008.  (Tr. 27.)  At step two, the ALJ found that Plaintiff had the following medically determinable impairments: "arthritis, osteoarthritis, obesity, hypertension, degenerative disc disease of the cervical spine with cervical spondylosis and facet arthrosis, lung nodule due to coccidiomycosis, dysfunction of the major joints, polyarthralgias, gallstones status post cholecystectomy, left leg wound and cellulitis status post debridement, depression, bipolar II disorder, substance addiction disorder, in full sustained remission by report, and prescription narcotic dependency (20 C.F.R. 404.1521 *et seq*.)."  (Tr. at 27-28.)  The ALJ found that Plaintiff did not have an impairment or combination of impairments that significantly limited (or was expected to significantly limit) her ability to perform basic work-related activities for twelve consecutive months and, therefore, she did not have a severe impairment or combination of impairments.  (Tr. 28.)  The ALJ concluded her analysis at step two and determined that Plaintiff had not been under a disability as defined in the Act from September 15, 2008 through the date of her decision.  (Tr. 36.)  Therefore, the ALJ denied Plaintiff's application for a period of disability and disability insurance benefits.  (*Id.*)

1    **V.      Standard of Review**

2         The district court has the "power to enter, upon the pleadings and transcript of

3    record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

4    with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district

5    court reviews the Commissioner's final decision under the substantial evidence standard

6    and must affirm the Commissioner's decision if it is supported by substantial evidence

7    and it is free from legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996);

8    *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Even if the

9    ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are

10   harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

11        Substantial evidence means more than a mere scintilla, but less than a

12   preponderance; it is "such relevant evidence as a reasonable mind might accept as

13   adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

14   (citations omitted); *see also Webb v Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In

15   determining whether substantial evidence supports a decision, the court considers the

16   record as a whole and "may not affirm simply by isolating a specific quantum of

17   supporting evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

18   quotation and citation omitted).  The ALJ is responsible for resolving conflicts in

19   testimony, determining credibility, and resolving ambiguities.  *See Andrews v. Shalala*,

20   53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to

21   more than one rational interpretation, [the court] must defer to the ALJ's conclusion."

22   *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing

23   *Andrews*, 53 F.3d at 1041).

24   **VI.    Plaintiff's Claims**

25        Plaintiff argues that the ALJ erred by failing to provide clear and convincing

26   reasons for discounting Plaintiff's subjective complaints, and by relying on the opinion of

27   Dr. Chaffee, but rejecting the opinion of Dr. Steingard.  Plaintiff argues that based on

28   these errors in assessing the evidence, the ALJ further erred by concluding that Plaintiff's

impairments were not severe.  (Doc. 24 at 2.)  The Commissioner argues that the ALJ did not err.  (Doc. 31.)  The Court first considers the ALJ's assessment of the evidence, and then considers the ALJ's step-two determination.

### A.    The ALJ's Credibility Determination

Plaintiff asserts that the ALJ erred by discrediting her symptom testimony without providing clear and convincing reasons.  (Doc. 24 at 15.)  An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding her pain or other symptoms is credible.  *See Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014); *see also Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom.  *Smolen*, 80 F.3d at 1282.  Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce her pain.  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms, including pain, limit the claimant's ability to work.    *See* 20 C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and

1  intensity of the claimant's pain or other symptoms, precipitating and aggravating factors,

2  medication taken, and treatments for relief of pain or other symptoms.   *See* 20

3  C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

4      At this second evaluative step, the ALJ may reject a claimant's testimony

5  regarding the severity of her symptoms only if the ALJ "makes a finding of malingering

6  based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc.*

7  *Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and

8  convincing reasons" for finding the claimant not credible.[3]   *Carmickle*, 533 F.3d at 1160

9  (quoting *Lingenfelter*, 504 F.3d at 1036).   Because the ALJ did not specifically find

10  evidence of malingering, she was required to provide clear and convincing reasons for

11  concluding that Plaintiff's subjective complaints were not credible.

12                **1.      Boilerplate Rationale**

13      Plaintiff asserts that the ALJ erred by using "meaningless boilerplate" to discount

14  her credibility.   (Doc. 24 at 15.)   Plaintiff specifically argues that the ALJ stated that

15  Plaintiff's "medically determinable impairments could reasonably be expected to cause

16  only some of the symptoms alleged," but did not specify which symptoms, and then

17  found that Plaintiff's "statements concerning the intensity, persistence and limiting

18  effects of these symptoms are not credible to the extent that they are inconsistent with the

19  finding that the claimant has no severe impairment or combination of impairments."

20  (Doc. 24 at 15-16 (citing Tr. 30).)

21      As Plaintiff argues, and the Commissioner appears to agree (Doc. 31 at 11), this

22  circular reasoning alone is insufficient to support the ALJ's credibility determination.

23  *See Leitheiser v. Astrue*, 2012 WL 967647, at *9 (D. Or. Mar. 16, 2012) (stating that

24  discounting "a claimant's credibility because it is inconsistent with a conclusion that must

25  itself address the claimant's credibility is circular reasoning and is not sustained by this

26  court"); *Hale v. Astrue*, 2011WL 6965856, at *4 (D. Or. Nov. 30, 2011) (same).

27

28      [3]  The Ninth Circuit has rejected the Commissioner's argument (Doc. 31 at 10-11.) that a lesser standard than "clear and convincing" should apply.  *See Garrison*, 759 F.3d at 1015 n.18.

1    Accordingly, the Court considers whether the ALJ provided other legally sufficient
2    reasons for discounting Plaintiff's subjective complaints.

### 2.        Plaintiff's Activities

4        The ALJ discounted Plaintiff's subjective complaints because she "engaged in a
5    somewhat normal level of daily activities and interests."  (Tr. 29.)  The ALJ noted that
6    Plaintiff performed some household chores, fed and played with her pets, shopped,
7    managed her finances, visited with others, socialized on the phone and computer, went
8    out alone, regularly attended church, visited her son in Phoenix, and completed her
9    activities of daily living.  (*Id.*)  Plaintiff argues that her participation in these activities is
10   not a legally sufficient reason for discounting her credibility because the ALJ did not find
11   that Plaintiff spent a substantial part of her day engaged in activities that were
12   inconsistent with her allegations of disabling limitations.  (Doc. 24 at 17 (citing *Vertigan*
13   *v. Halter*, 260 F.3d 1044, 1049-50 (9th Cir. 2001) (stating that the fact a claimant engages
14   in normal daily activities "does not in any way detract from [her] credibility as to [her]
15   overall disability").)

16       Even if it would have been error for the ALJ to discount Plaintiff's credibility
17   solely on the basis of her "somewhat normal level of daily activities," *see Vertigan* 260
18   F.3d at 1050, the ALJ did not base her credibility determination on Plaintiff's
19   participation in activities alone.  Rather, as the Commissioner notes (Doc. 31 at 16), the
20   ALJ noted inconsistencies in Plaintiff's description of her activities.  (Tr. 29 (citing
21   Admin. Hrg. Exs. 5E and 14E).)[4]    As the ALJ noted, Plaintiff testified at the
22   administrative hearing that she was uncomfortable and became frustrated around people.
23   (Tr. 29.)  However, in November 2010 and July 2011 Function Reports, Plaintiff stated
24   that she did not like to be alone.  (Tr. 189, 237.)  In those reports Plaintiff also stated that,
25   on a daily basis, she socialized with others in person, on the phone, or on the computer.
26   (Tr. 190, 234.)  She also stated that she attended church and went shopping once or twice

27   _____

28       [4]  Administrative Hearing exhibits 5E and 14E are located at Tr. 186-194 and 231-
     39, respectively.

- 19 -

a month.  (Tr. 190, 234-35.)  She indicated that she got along well with authority figures. (Tr. 192, 237.)   A treatment note indicates that Plaintiff reported she "generally g[ot] along with people."  (Tr. 29 (citing Admin. Hrg. Ex. 1F at 22).)

As part of the overall disability analysis, and in weighing various allegations and opinions, the ALJ must consider whether there are any inconsistencies in the evidence, such as a claimant's inconsistent statements.  *See* 20 C.F.R. § 404.1529(c)(4) (stating that an ALJ must consider "whether there are any inconsistencies in the evidence."); Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *5 (stating that a strong indicator of the credibility an individual's statements is their consistency, both internally and with other information in the record).   Thus, the ALJ properly considered Plaintiff's inconsistent statements regarding her daily activities to discount her credibility.

### 3.        Plaintiff Worked After the Alleged Onset Date

The ALJ also discounted Plaintiff's credibility because she worked after the alleged onset date, September 15, 2008.  (Tr. 30.)  The ALJ noted that Plaintiff worked for four weeks for the Census Bureau in 2009.  (*Id.*)  Plaintiff stated that she left the job because the work was finished, but she planned to be called back to work by the Census Bureau in the future.  (Tr. 30 (citing Admin. Hrg. Ex. 1F at 24).)  The ALJ stated that because there was "no evidence of a significant deterioration in the claimant's medical condition since that layoff," it was reasonable to infer that Plaintiff's impairments would not prevent performance of that job.  (Tr. 30.)

Plaintiff argues that her work for the Census Bureau in 2009 was not a legally sufficient reason for discounting her credibility because the ALJ already determined that she had not performed substantial gainful activity during the relevant period.  (Doc. 24 at 18 (citing Tr. 27).)  Plaintiff also argues that the record does not support he ALJ's finding that her condition did not deteriorate after 2009.  (Doc. 24 at 18 (referring to Plaintiff's degenerative arthritis).)

The Court rejects Plaintiff's arguments.  First, the ALJ's finding is consistent with the applicable regulations, which provide that "[e]ven if the work you have done was not

substantial gainful activity, it may show that you are able to do more work than you actually did." 20 C.F.R. § 404.1571.  Consistent with the regulations, the Ninth Circuit has cited work activity as undermining a claim of disability.  For example, in *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1221 and 1227 (9th Cir. 2009), the Ninth Circuit affirmed the district court's determination that a claimant's allegation of disability was undermined by the fact that the claimant worked part time as a "personal caregiver for two years" after her alleged disability onset date.  Similarly, in *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006), the Ninth Circuit affirmed the district court's conclusion that the claimant was not disabled when he "was able to continue his past work activities as a contractor" after his alleged disability onset date.

Second, the ALJ's conclusion that Plaintiff's condition (degenerative arthritis) did not significantly deteriorate after 2009 is supported by substantial evidence in the record. The record includes evidence that Plaintiff's examination findings were unremarkable with some tenderness in her back and joints, and a full or mildly reduced range of motion in her back and extremities.  (Tr. 346, 349, 352, 366, 383, 384, 386-87, 388-89, 403, 407, 412, 450, 487, 549, 554, 557, 560, 688.)  Additionally, imaging studies and x-rays after 2009 showed mostly normal findings, with some mild to moderate findings.  (Tr. 353, 356, 390-91, 403 (mild arthritic changes in the knees), 441 (normal bony architecture and joints in the knee), 470 (mild arthritic changes in the knee), 472 (mild tricompartment osteoarthritic degenerative changes).)  Although the record could be interpreted more favorably to Plaintiff, the Court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *see Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004).  Thus, the ALJ's determination that Plaintiff's condition did not significantly deteriorate after 2009 is supported by substantial evidence in the record.

The ALJ also discounted Plaintiff's credibility because she continued to apply for cashiering and office jobs after the alleged disability onset date.  (Tr. 30.)  The ALJ stated that the "fact that the claimant continued to look for work, even part time, demonstrates

the claimant believed she had some capacity to work, which is inconsistent with a claim for disability.  (*Id.*)  Plaintiff argues that this is an insufficient reason for discounting her credibility because looking for work is not necessarily inconsistent with disabling limitations.  (Doc. 24 at 18.)  However, as discussed below, the cases Plaintiff cites to support her arguments are distinguishable from this case.  (Doc. 24 at 18-19.)

Plaintiff cites *Lingenfelter*, 504 F.3d at 1036-38, a case in which the court found that the claimant's credibility was not undermined by his attempt to work for nine weeks, which failed because of his impairments.  Here, unlike *Lingenfelter*, there is no objective evidence that Plaintiff stopped working for the Census Bureau in 2009 because of her symptoms.  Rather, she reported that the work was done and that she "planned to be called back . . . ."  (Tr. 27, 297.)  Additionally, unlike the claimant in *Lingenfelter*, Plaintiff continued applying for "cashier jobs" and "some office jobs" (Tr. 29, 62-63) after the alleged disability onset date.  Plaintiff's continued search for work was a clear and convincing reason for the ALJ's to discount her credibility.  *See Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (affirming credibility determination when the claimant "unsuccessfully sought work").

Plaintiff also cites *Lewis v. Apfel*, 236 F.3d 503, 516 (9th Cir. 2001), which is inapplicable because it concerned whether the claimant's work constituted substantial gainful activity, not whether the claimant's continued work, or continued search for work, after the disability onset date undermined his credibility.  The three remaining cases that Plaintiff cites are not relevant.  (Doc. 24 at 19.)  Plaintiff cites *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993), which is not relevant because in that case the Ninth Circuit found that the ALJ erred by failing to make specific findings to support his disability determination.  Here, the ALJ discussed specific facts to support her conclusion that Plaintiff continued to look for work after the alleged disability onset date.  (Tr. 30.)  Similarly, *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978), does not apply because it addressed a doctor's release of a claimant to try to engage in limited work for vocational rehabilitation, not a claimant's continued efforts to work after the alleged onset date.

Finally, *Parish v. Califano*, 642 F.2d 188, 192 (6th Cir. 1981), is a Sixth Circuit case and is not binding on this Court.

Therefore, the Court concludes that the ALJ did not err by discounting Plaintiff's credibility based on evidence that she worked for the Census Bureau and applied for other work after the alleged disability onset date.

### 4.    Impairments Managed by Treatment

In support of her adverse credibility determination, the ALJ stated that there was evidence in the record that Plaintiff's musculoskeletal impairments of the joints and cervical spine were "being managed medically, and [were] amenable to proper control by adherence to recommended medical management and medication compliance."  (Tr. 30. (citing Admin. Hrg. Exs. 2F at 4, 5; Ex. 5F at 3, 7, 9; Ex. 7F at 2; Ex. 28F at 7, 15).) Plaintiff argues that this statement constitutes the ALJ's opinion of the medical evidence and that the ALJ did not explain how the medical evidence detracted from Plaintiff's statements about the severity of her symptoms.  (Doc. 24 at 19.)

To support her argument, Plaintiff relies on *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).  In *Burrell*, the court found that the ALJ's adverse credibility determination was not supported by substantial evidence.  *Id.* at 1135.  The court explained that the ALJ stated that the claimant's symptom testimony was not credible to the extent it was inconsistent with the ALJ's RFC assessment, but did not provide any reasons for the credibility determination.  *Id.* at 1137.  Rather, the ALJ's decision "drift[ed] into a discussion of the medical evidence."  *Id.*  The court noted that "three single-spaced pages after the adverse credibility determination," the ALJ gave some reasons for the adverse credibility determination.  However, the court found those reasons insufficient.  *Id.* at 1137-1140.

Unlike the ALJ's decision in *Burrell*, the ALJ in this case listed several reasons to support her adverse credibility determination.  (Tr. 29-30.)  Additionally, the ALJ explained that Plaintiff's symptom testimony was not credible because her musculoskeletal impairments were being managed medically and were amenable to

control by medication.  (Tr. 30.)  The ALJ cited specific portions of the record to support her conclusion that Plaintiff's musculoskeletal impairments were controlled with treatment.  (Tr. 30 (citing Tr. 30. (citing Admin. Hrg. Ex. 2F at 4, 5; Ex. 5F at 3, 7, 9; Ex. 7F at 2; Ex. 28F at 7, 15).)

In assessing a claimant's credibility about her symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication" and treatment, other than medication, that the claimant has received for relief of pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(iv) and (v).  As the ALJ noted, the record included evidence that Plaintiff's musculoskeletal symptoms responded to treatment.  (Tr. 348 (joint pain mildly alleviated with oxycodone),[5] Tr. 349 (shoulder abduction improved), Tr. 383 ("doing much better clinically on a combination of fentanyl . . . and morphine sulfate . . . ."), Tr. 387 ("cervical spondylitic symptoms have gone away . . . ."), Tr. 388 (fentanyl helped Plaintiff "tremendously"), Tr. 674 (Plaintiff reported that her right knee no longer hurt and that she had improved with physical therapy), Tr. 682 (Plaintiff reported that pain related to physical therapy was resolved and she could perform her activities of daily living).)  Evidence that treatment can control a claimant's symptoms may be a clear and convincing reason to find a claimant less credible.  *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (stating that "[i]mpairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for SSI benefits.")  Because substantial evidence in the record reflects that Plaintiff's musculoskeletal symptoms were controlled with treatment, the ALJ did not err in rejecting Plaintiff's related symptom testimony on that basis.

Additionally, the Court rejects Plaintiff's argument that the ALJ offered an improper medical opinion by finding that Plaintiff's musculoskeletal symptoms were controlled with treatment.  (Doc. 24 at 20.)  Rather, she made a permissible inference based on her review of the medical record.  *See Tommasetti v. Astrue*, 533 F.3d 1035,

---

[5] Dr. Colceriu later transferred Plaintiff to fentanyl to prevent her from becoming addicted to oxycodone and to reduce her use of morphine.  (Tr. 346, 349.)

1040 (9th Cir. 2008) (an ALJ may infer that a claimant's "response to conservative treatment undermines [claimant's] reports regarding the disabling nature of his pain"); *Gonzales v Colvin*, 2014 WL 465855, at \*3-4 (D. Ariz. Feb. 4, 2014) (rejecting the plaintiff's argument that one of reasons the ALJ gave for rejecting a physician's opinion — the medical evidence did not support the physician's opinion — was not an improper medical opinion and concluding that the ALJ properly assessed the medical evidence as required by the regulations); *McKinzie v. Colvin*, 2013 WL 4431034, at \*5 (D. Ariz. Aug. 16, 2013) (concluding that the ALJ did not substitute his own medical opinion for the treating physician's opinion and finding that the ALJ's disability determination was based another doctor's opinion and the plaintiff's complaints).

### 5.    Subjective Complaints not Supported by Objective Evidence

The ALJ found that Plaintiff's "credibility regarding the severity of her symptoms [was] diminished because those allegations were greater than expected in light of the objective evidence of record."   (Tr. 30.)   Plaintiff argues that this is not a legally sufficient reason for discounting her credibility.  (Doc. 24 at 20.)

As the Commissioner notes (Doc. 31 at 7), the absence of fully corroborative medical evidence cannot form the sole basis for rejecting the credibility of a claimant's subjective complaints.  *See Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) (it is legal error for "an ALJ to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings"), *superseded by statute on other grounds as stated in Bunnell v. Sullivan*, 912 F.2d 1149 (9th Cir. 1990); *see also Burch*, 400 F.3d at 681 (explaining that the "lack of medical evidence" can be "a factor" in rejecting credibility, but cannot "form the sole basis"); *Rollins v. Massanari*, 261 F.3d 853, 856-57 (9th Cir. 2001) (same).  However, this was not the sole basis of the ALJ's credibility determination and the ALJ provided other legally sufficient reasons for discounting Plaintiff's symptom testimony.

### 6.   Routine Care

When assessing Plaintiff's subjective complaints related to her mental impairments, the ALJ noted that Plaintiff received treatment on an intermittent basis that consisted of "routine, non-emergency medication review with medication modification and some counseling for various forms of affective disorders."   (Tr. 33.)   Plaintiff challenges this reason for the ALJ's adverse credibility determination stating that "these errors have already been discussed in the context of [Plaintiff'] physical impairments; that discussion need not be repeated."   (Doc. 24 at 22.)   Plaintiff, however, does not cite to the portion of her discussion that addressed these issues.   The Court is not required to develop Plaintiff's arguments.   *See Independent Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) (the court will not consider any claims that were not specifically and distinctly argued in a party's opening brief).   However, because the Commissioner does not discuss or defend this reason for the ALJ's adverse credibility determination (Doc. 31 at 10-17), the Court does not consider it when determining whether the ALJ provided sufficient reasons for discounting Plaintiff's subjective complaints.

### 7.   Mental Health Improvement

The ALJ also noted that Plaintiff's mental health improved from time to time and that her mental status examinations were "essentially normal." (Tr. 34.)   Plaintiff argues that these are insufficient reasons for the ALJ's adverse credibility determination. (Doc. 24 at 22-24.)   The Commissioner does not defend this rationale for the ALJ's adverse credibility determination.[6]   (Doc. 31 at 10-17.)   Accordingly, the Court does not consider this reason in determining whether the ALJ provided sufficient reasons to support her adverse credibility determination.

---

[6]   However, the Commissioner argues that the mental status examinations support the ALJ's determination that Plaintiff's mental impairments were not severe.   (Doc. 31 at 10.)

### 8.    The ALJ's Observations

Finally, the ALJ discredited Plaintiff's subjective complaints based on her observations at the administrative hearing.  (Tr. 29.)   At the administrative hearing, Plaintiff testified that she used a walker or a wheel chair when she went out.  (Tr. 59.) The ALJ observed that Plaintiff "presented without her walker and admitted she was able to walk into the building without this device." (Tr. 29, 59-60.)  Plaintiff did not challenge this reason for the ALJ's adverse credibility determination in her opening brief. (Doc. 24.)

The regulations and the Ninth Circuit recognize that an ALJ may consider "her own recorded observations of the individual [at the administrative hearing] as part of the overall evaluation of the credibility of the individual's statements."  SSR 96-7p, 1996 WL 374186, at *5; *Orn*, 495 F.3d at 639 (while ALJ's observations of claimant's functioning may not form the sole basis for discrediting claimant's testimony, they may be used in the "overall evaluation of the credibility of the individual's statements"); *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999) ("Although this Court has disapproved of so-called 'sit and squirm' jurisprudence, the inclusion of the ALJ's personal observations does not render the decision improper.").   Because the ALJ's observations of Plaintiff did not form the sole basis for discrediting her testimony, the ALJ did not err by including her observations in the credibility analysis.  *See Verduzco*, 188 F.3d at 1090.

### 9.    Conclusion

In summary, although the Court does not accept all of the reasons the ALJ stated in support of her adverse credibility determination, the ALJ provided legally sufficient reasons that are supported by substantial evidence to support her credibility determination and, therefore, the Court affirms it.  *See Batson*, 359 F.3d at 1197 (stating that the court may affirm an ALJ's overall credibility conclusion even when not all of the ALJ's reasons are upheld); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (stating that "[e]ven if we discount some of the ALJ's observations of [the claimant's]

inconsistent statements and behavior . . . we are still left with substantial evidence to support the ALJ's credibility determination.").

## B. Weighing Medical Opinion Evidence

Plaintiff also asserts that the ALJ erred by assigning significant weight to Dr. Chaffee's opinion and by rejecting Dr. Steingard's opinions. (Doc. 24 at 26.) The Court first sets forth the standards for assigning weight to medical evidence, and then applies those standards to consider the weight the ALJ assigned to Dr. Chaffee's and Dr. Steingard's opinions.

## 1. Weight Assigned to Medical Source Opinions

In weighing medical source evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight is given to a treating physician's opinion. *Id.* The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion. *Id.*; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

Opinions from non-examining medical sources are entitled to less weight than opinions from treating or examining physicians. *Lester*, 81 F.3d at 831. Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When evaluating medical opinion evidence, the ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the

medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion . . . ."  *Orn*, 495 F.3d at 631.

### 2.    Weight Assigned to Dr. Chaffee's Opinion

Plaintiff argues that the ALJ erred by relying on examining physician Dr. Chaffee's opinion to reject Plaintiff's testimony that she could not stand or sit for long periods of time and that she had a lot of weakness in her hands related to lifting or holding things.  (Doc. 24 at 26-27.)

On examination, Dr. Chaffee found that Plaintiff had normal muscle bulk and tone, full strength in the upper and lower extremities, a normal gait and station, normal coordination, and a normal range of motion in her hips, knees, ankles, shoulders, elbows, wrists, cervical, lumbar and thoracic spine.  (Tr. 446-47.)  He found no swelling or crepitation in either knee.  (*Id.*)  Plaintiff did not exhibit pain with straight leg raising to sixty degrees and she could squat normally.  (*Id.*)  She had full grip strength.  (Tr. 447.)  Based on his examination, Dr. Chaffee opined that Plaintiff did not have any limitations in functioning.  (Tr. 34, 447.)  The ALJ assigned Dr. Chaffee's opinion significant weight because it was "well supported by the evidence of record and the claimant's admitted activities of daily living."  (Tr. 34.)  The ALJ did not err in relying on the opinion of the examining physician to support her adverse credibility determination and to support her determination that Plaintiff's musculoskeletal impairments were not severe.

In *Carmickle v. Comm'r. Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008), the ALJ rejected the claimant's testimony in favor of a contradictory medical opinion.  The Ninth Circuit stated that "[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's subjective complaints."  *Id.* (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)).  Similarly, in *Johnson*, the Ninth Circuit rejected a claimant's testimony because it was inconsistent with "the relevant medical evidence," including with a one-time examining doctor's "neurological evaluations."  60 F.3d at 1434).  Thus, the ALJ did not err by discounting Plaintiff's symptom testimony because it was inconsistent with Dr. Chaffee's opinion.

Additionally, the Ninth Circuit recognizes that an examining physician's opinion can constitute substantial evidence to support an ALJ's disability determination. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (an examining physician's "opinion alone constitutes substantial evidence, because it rests on his own independent examination of" the claimant); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").

Thus, Dr. Chaffee's opinion is substantial evidence to support the ALJ's disability determination because it rests on his independent examination of Plaintiff. *See Tonapetyan,* 242 F.3d at 1149. Dr. Chaffee's opinion was consistent with evidence in the medical record indicating that physical examination findings were mainly unremarkable and reflected some tenderness and mildly reduced range of motion. (Tr. 346 (full range of motion (ROM) in elbows, mild tenderness in spine), Tr. 349 (normal rotation in hips, knees tender on palpation), Tr. 352 (full ROM in lower extremities, hand grip intact, "exquisite tenderness" in knees), Tr. 366 (knee ROM intact, no synovitis in hands or wrists, full ROM in ankles), Tr.382 (full ROM in upper extremities, moderate tenderness in lower spine), Tr. 384 (no synovitis in upper extremities, no instability in knees, spine tender throughout); Tr. 386-87 (cervical spondylosis disappeared, ambulated without assistance, mild tenderness in spine and right heel), Tr. 388-89 (no synovitis in upper or lower extremities,  mild to moderate tenderness in spine), Tr. 403 (knees tender, nearly full ROM in knees), Tr. 407 (normal gait), Tr. 412 (some tenderness in knees), Tr. 487 (full ROM in neck, intact coordination, no tenderness in lower extremities), Tr. 549 (ambulated independently, joint tenderness in upper extremities with no synovitis, full ROM in upper extremities, spine tender, no synovitis in lower extremities, normal hand grip), Tr. 554 (ambulated independently, mild joint tenderness in upper extremities, no synovitis, full range of motion in upper extremities, normal hand grip), Tr. 557 (ambulated independently, mild limp, joint tenderness in upper extremities with no

synovitis, non-focal spinal tenderness, normal hand grip), Tr. 560 (ambulated independently, tenderness in joints of upper extremities, no synovitis, non-focal tenderness in spine, normal hand grip), and Tr. 668 (Plaintiff reported 95% improvement in right knee pain and 50% improvement in left knee pain, full ROM in right knee functional ROM in left knee, improved strength in hips and knees with some weakness in left knee).)

Additionally, Dr. Chaffee's opinion was consistent with imaging studies that showed largely normal, with some mild to moderate, findings. (Tr. 31, 353, 403, 356, 390-91, 441, 443, 470, 472.) Accordingly, the ALJ did not err in assigning significant weight to Dr. Chaffee's opinion.

### 3.    Dr. Steingard's Opinion

State agency physician Dr. Steingard examined Plaintiff and gave opinions regarding her mental functional abilities. (Tr. 438-39.) The ALJ gave Dr. Steingard's opinions little weight because she concluded they were inconsistent with the record. (Tr. 35.) Because Dr. Steingard is an examining medical source, her opinion cannot be rejected without specific and legitimate reasons that are based on substantial evidence in the record. *See Valentine v. Comm'r of Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009).

The ALJ found Dr. Steingard's opinions "contradicted by the evidence of record." (Tr. 35.) This is a valid reason for rejecting Dr. Steingard's opinions. *See Tommasetti*, 533 F.3d at 1041 (finding it not improper for an ALJ to reject a physician's opinion that is inconsistent with the record); 20 C.F.R. § 404.1527(c)(4); *see also Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 601 (9th Cir. 1999) (discounting medical opinion, in part, because it was unreasonable in light of "other evidence in the record"). The ALJ's finding is also supported by substantial evidence, including the evidence cited in her decision. (Tr. 35.)

Dr. Steingard found that Plaintiff was limited in the area of understanding and memory. (Tr. 438.) She specifically found that Plaintiff would have "problems with

detailed instructions or complicated procedures," she had a limited ability to multitask, she "got a little agitated when asked for some simple general information," and "could not recall any objects at three minutes." (*Id.*)  However, as the ALJ noted, this finding is not supported by numerous mental status examinations that indicated that Plaintiff's memory[7] was good (Tr. 288, Tr. 618 (noting good recall of events)), or intact (Tr. 313, 315, 320, 397, 402).

Dr. Steingard also opined that Plaintiff had limitations in the area of sustained concentration or persistence, described as "the ability to carry out simple instructions, maintain attention and concentration, and maintain regular attendance."  (Tr. 438.) However, as the ALJ noted (Tr. 35), numerous mental status examinations indicated that Plaintiff was alert (Tr. 313, 315, 319, 397, 402, 464, 571, 578, 585, 588), had fair (Tr. 315) or good concentration (Tr. 313, 320, 397, 402, 465, 571, 578, 585, 589), and a logical or unremarkable thought process (Tr. 288, 313, 315, 397, 402, 464, 571, 578, 585, 589, 618).

Dr. Steingard also found that Plaintiff was limited in the area of social interaction.[8] She noted that Plaintiff was tearful and crying during the entire interview and was "a little" irritable.  (Tr. 439.)  However, as the ALJ noted, the mental status examinations indicated that Plaintiff had a good or unremarkable appearance (Tr. 319, 402, 464, 570, 577, 588, 596), good or unremarkable eye contact (Tr. 315, 319, 402, 464, 571, 578, 588, 596), an appropriate affect (Tr. 288, 319, 464, 571, 578, 588, 618), a euthymic mood (Tr. 464, 571, 578, 589) or relaxed mood (Tr. 315), and she "had good interaction" and was "talkative." (Tr. 625.)

In summary, as the ALJ noted, Plaintiff's mental status examinations were consistently unremarkable and did not support the limitations that Dr. Steingard assessed.

---

[7]  Memory was described as "recent, remote, retention and recall (3 object memory, recall; immediate / 5 minutes; digit span memory)."  (Tr. 288, 618.)

[8]  Dr. Steingard described social interaction as "the ability to get along with co-workers, respond appropriately to supervision, maintain socially appropriate behavior, and adhere to basic standards of neatness."  (Tr. 438.)

Plaintiff argues that the ALJ could not rely on mental status examinations to reject Dr. Steingard's opinion. (Doc. 24 at 29.) However, she does not cite any authority to support that proposition, and the ALJ must consider the extent to which an opinion is consistent "with the record as a whole." 20 C.F.R. § 404.1527(c)(4); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999) (discounting medical opinion, in part, because it was unreasonable in light of "other evidence in the record"). Accordingly, the ALJ did not err by considering the mental status examinations when determining what weight to assign Dr. Steingard's opinions.

The ALJ also rejected Dr. Steingard's opinions regarding Plaintiff's mental functional abilities as inconsistent with Plaintiff's reported daily activities. (Tr. 35.) This is a legally sufficient reason for discounting Dr. Steingard's opinion. *See Magallanes*, 881 F.2d at 754 (conflicts between treating physician's opinion and claimant's own testimony properly considered by ALJ in rejecting treating physician's opinion in favor of that offered by non-treating, non-examining physician); *Morgan*, 169 F.3d at 601-02 (upholding ALJ's decision rejecting physician's conclusion that claimant suffered from marked limitations because claimant's reported activities of daily living contradicted that conclusion). Plaintiff reported that she relied on her family for support (Tr. 290), went to church and spent time with her son (Tr. 295), she cared for her adult children, managed her finances, went shopping, and completed household chores, and socialized in person or on the phone or computer. (Tr. 189, 190, 282, 295, 309.) Plaintiff also reported that she helped care for her terminally ill brother for several months. (Tr. 587, 588, 592.)

In summary, the ALJ gave legally sufficient reasons for discounting Dr. Steingard's opinions regarding Plaintiff's mental functional limitations. Having determined that the ALJ did not err in discounting Plaintiff's subjective complaints or in assigning weight to the medical opinion evidence, the Court considers whether the ALJ erred at step two by finding that Plaintiff did not have a severe impairment or combination of impairments.

### C.      Step-Two Determination

The step-two analysis is "a de minimis screening device [used] to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d at 1273, 1290 (9th Cir. 1996). At step two of the five-step sequential inquiry, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). The claimant has the burden of presenting evidence of medical signs, symptoms, and laboratory findings that establish a medically determinable physical or mental impairment that is severe, and that can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months. *See Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005) (citing 42 U.S.C. § 423(d)(3), 1382c(a)(3)(D)); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).

The Social Security Regulations and Rulings, as well as case law applying them, discuss the step-two severity determination in terms of what is "not severe." According to the regulations, an impairment or combination of impairments is not severe if it does not "significantly limit" the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c), § 416.920(c), § 416.921(a). Basic work activities are "abilities and aptitudes necessary to do most jobs," including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 C.F.R. § 404.1521(b); 416.921(b)(1). They also include "seeing, hearing, and speaking," "[u]nderstanding, carrying out and remembering simple instructions," "us[ing] judgment," "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routing work setting." 20 C.F.R. §§ 404.1521(b)(2)-(6), 416.921(b)(2)-(6). At the step-two inquiry, ALJ must consider the combined effect of all of the claimant's impairments on his ability to function, without regard to whether each alone was sufficiently severe. *See* 42 U.S.C. § 423(d)(2)(B).

Applying the standard of review to the step-two determination, a court must determine whether substantial evidence supports the ALJ's finding that the medical evidence established that the claimant did not have a medically severe impairment or combination of impairments. *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005); *see also Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988) ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here."). An ALJ properly finds that an impairment or combination of impairments are "not severe" if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work." *Webb*, 433 F.3d at 686 (citation omitted).

As previously stated, at step two, the ALJ found that Plaintiff had several medically determinable impairments, but found that those impairments, alone or in combination, were not severe. (Tr. 28.) In her opening brief, Plaintiff generally argues that the ALJ erred by concluding that Plaintiff's impairments were not severe. (Doc. 24 at 13.) In her description of her claims, Plaintiff does not clarify whether she is arguing that the ALJ erred in failing to find any particular impairment not severe, or whether she is arguing that the ALJ erred in failing to find that her combination of impairments was not severe. (*Id.*) However, later in her opening brief, Plaintiff states that the "ALJ's denigration of the severity of her mental impairments was . . . flawed." (Doc. 24 at 22.) Thus, it appears that Plaintiff challenges that the ALJ's determination that her mental impairments (depression and bipolar disorder) were not severe.

In her reply, Plaintiff agrees with the Commissioner that her "obesity, hypertension, gallstones, [and] respiratory problems" were not severe impairments. (Doc. 36 at 6.) Plaintiff also agrees that her "leg injury" did not meet the twelve-month durational requirement. (*Id.*) She states that her opening brief refers to medical records related to her musculoskeletal impairments (Doc. 36 at 7) and, thus, she challenges the ALJ's determination that her musculoskeletal impairments were not severe. (*Id.* at 6-7.)

In summary, Plaintiff claims that the ALJ erred by failing to find that her musculoskeletal impairments (arthritis, osteoarthritis, degenerative disc disease of the cervical spine with cervical spondylosis and facet arthritis, dysfunction of the major joints, and polyarthralgias) and mental impairments (depression and bipolar disorder) were severe.

### 1.   Musculoskeletal Impairments

The ALJ concluded that Plaintiff's musculoskeletal impairments were not severe. (Tr. 31.)   As the ALJ noted, examination findings were largely unremarkable and indicated some tenderness and mildly reduced range of motion.   (Tr. 30-31 (citing Tr. 346, 349, 352, 366, 382, 384, 386-87, 388-89, 403, 407, 412, 450, 487, 549, 554, 557, 560, 668).)   Additionally, as the ALJ noted, imaging studies showed largely normal, with some mild to moderate, findings.   (Tr. 31, 353, 403, 356, 390-91, 441, 443, 470, 472.) Dr. Chaffee opined that Plaintiff's physical impairments would not cause any functional limitations.   (Tr. 444.)   Additionally, the ALJ properly discounted Plaintiff's subjective complaints about her limitations related to her musculoskeletal impairments.  *See* Section VI.A. Substantial evidence in the record supports that ALJ's conclusion that Plaintiff's musculoskeletal impairments were not severe.

### 2.   Mental Impairments

"The steps outlined in 20 C.F.R. § 404.1520 apply to the evaluation of physical and mental impairments."  20 C.F.R. § 404.1520a(a).   In addition, when the severity of mental impairments is evaluated, a special technique is followed.  *Id.*   Under the special technique, first it is determined whether the claimant has a medically determinable mental impairment, and then the degree of functional limitation resulting from the impairment is rated. 20 C.F.R. § 404.1520a(b).   Rating the degree of functional limitation is based on the extent to which the claimant's impairment interferes with her ability to function independently, appropriately, effectively, and on a sustained basis.   20 C.F.R. § 404.1520a(c)(2). Section 404.1520a(c) expressly references the Listing of Impairments for information about the factors to be considered in rating the degree of functional

limitation. 20 C.F.R. §§ 404.1520a(c)(2), (3).  This section cites 12.00C of the Listing of Impairments and identifies four broad functional areas in which the degree of functional limitation is to be rated: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.   20 C.F.R. § 404.1520a(c)(3). After the degree of functional limitation is rated, then the severity of the claimant's mental impairments is determined.  20 C.F.R. § 404.1520a(d).

Here, the ALJ applied the special technique for evaluating the severity of mental impairments.  (Tr. 33.)  She found that Plaintiff's medically determinable impairments did not cause more than minimal limitation in her ability to perform basic mental work activities and were therefore non-severe.  (Tr. 34.)  She expressly stated, "[i]n making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments . . . ."  (Tr. 33.)  The ALJ then explained the findings that supported her rating of mild limitation in the areas of daily living, social functioning, and concentration, persistence, or pace.  (Tr. 33-34.)  Regarding the fourth area, she found that Plaintiff had experienced no episodes of decompensation.  (Tr. 33.)  The ALJ cited the regulations governing the special technique for evaluation of mental impairments, and concluded that Plaintiff's mental impairments were non-severe.  (Tr. 33-34.)

Accordingly, the ALJ did not err in concluding that Plaintiff's mental impairments were not severe because she expressly incorporated the special technique for the evaluation of mental impairments.  As the ALJ noted, the mental status examinations are consistently unremarkable.   (Tr. 35.)  Additionally, to the extent that the step-two determination is based on the ALJ's rejection of Dr. Steingard's opinion and her adverse credibility determination, as discussed in Sections VI.A.1 and VI.B.3, the ALJ did not err in her assessment of that evidence.

**VII.   Conclusion**

The ALJ did not erred by rejecting Plaintiff's symptom testimony and Dr. Steingard's opinions, or by assigning significant weight to Dr. Chaffee's opinion.

Additionally, the ALJ did not err by concluding that Plaintiff did not have a severe impairment or combination of impairments and her determination is supported by substantial evidence in the record.  Accordingly, the Court affirms the Commissioner's disability determination.

Accordingly,

**IT IS ORDERED** that the Commissioner's disability determination is **AFFIRMED**.  The Clerk of Court is directed to enter judgment in favor of the Commissioner and against Plaintiff and to terminate this action.

Dated this 17th day of September, 2015.


_____
Bridget S. Bade
United States Magistrate Judge